# CHARLESTON.

THE BOWERS COMPANY *v.* KANAWHA VALLEY PRODUCTS COMPANY.

(No. 5339)

Submitted October 20, 1925.   Decided November 3, 1925.

1.   CONTRACTS—*Request for Change or Modification of Proposed Contract, Made Before Acceptance, Amounts to Rejection Thereof.*

     A request for a change or modification of a proposed contract, made before an acceptance thereof, amounts to a rejection of it.   (p. 284.)

     (Contracts, 13 C. J. § 82.)

2.   SAME—*Proposition to Accept Offer on Terms Varying From Those Offered is Rejection Thereof.*

     A party to whom an offer of contract is made must either accept it wholly or reject it wholly. A proposition to accept on terms varying from those offered is a rejection of the offer, and a substitution in its place of the counter proposition. It puts an end to the negotiation so far as the original offer is concerned.   (p. 284.)

     (Contracts, 13 C. J. § 110.)

3. SAME—*Party Who Has Submitted Counter Proposition Cannot, at His Own Option, Revive and Accept Original Offer; to Give Rejected Offer New Vitality, There Must be Renewal of Contract or Renewed Assent to it.*

Hence, the party who has submitted such counter-proposition, cannot, at his own option, revive and accept the original offer which he has once virtually rejected. In order to give the rejected offer any new vitality, there must be a renewal of it, or renewed assent to it, by the party who made it. (p. 284.)

(Contracts, 13 C. J. § 110.)

4. SAME—*Revival of Rejected Offer Essential Part of Contract, and Must be Proven as Substantive Fact.*

The revival of such rejected offer is an essential part of the contract, and it must be proven as a substantive fact. (p. 284.)

(Contracts, 13 C. J. §§ 110, 906 [Anno.])

5. MINES AND MINERALS—*Reply to Offer Held Rejection Thereof, and Substitution of Counter Proposition, Putting End to Negotiations as Far as Original Offer Was Concerned.*

Where an offer is made by a lessee in an oil and gas lease, by letter, to his lessor, to allow said lessor "one-eighth of 36 percent of the gasoline" produced from the latter's land, and the said lessor replies to such offer, "Believe can get action directors on gasoline proposition on basis one-eighth total gasoline", such reply is a rejection of the offer, and a substitution in its place of the counter proposition, and puts an end to the negotiation so far as the original offer is concerned. (p. 285.)

(Mines and Minerals, 27. Cyc. p. 734.)

6. PRAYER FOR CANCELLATION OF OIL AND GAS LEASE HELD PROPERLY DENIED.

A case where plaintiff's prayer for cancellation of the lease is properly denied. (p. 290.)

LIVELY, PRESIDENT, absent.

(Mines and Minerals, 27 Cyc. p. 692.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Kanawha County.

Suit by the Bowers Company against the Kanawha Valley Products Company. From a decree affirming the final decree of the court of common pleas, dismissing its bill, and refusing relief sought, plaintiff appeals.

*Affirmed.*

*Price, Smith & Spilman* and *Conley & Johnson,* for appellant.

*Harold A. Ritz* and *Campbell & McClintic,* for appellee.

WOODS, JUDGE:

The Bowers Company, a corporation, appeals from a decree pronounced by the circuit court of Kanawha county, affirming a final decree of the court of common pleas of said county, dismissing its bill and refusing it the relief sought.

In 1912 the Bowers heirs, residing in New Jersey and Pennsylvania (later incorporated as the Bowers Company), leased 1476 acres, situate in Kanawha county, to the Kanawha Valley Products Company, a West Virginia corporation, for oil and gas purposes. This lease grants to the lessee "all the natural gas and oil that may be obtained by said lessee at its own cost and expense from the said lands", and provides that the lessee shall pay to the lessor (1) a minimum yearly royalty of $1600; (2) ½c for every 1,000 cubic feet of gas measured by meter, and a royalty of ⅛ of all oil produced; (3) that its books shall be kept open to inspection of lessor; and (4) that lessee "shall not convey, assign, lease, underlet, or sublet, or in any way set over, to any person or persons, or corporation, at any time, any of its interests, rights, term or terms, in whole or in part, under this agreement, without the consent, in writing of said lessors." The lessees developed the property under said lease.

In the latter part of August, 1918, Godfrey L. Cabot, acquired the controlling interest in the defendant corporation. On August 8th, the lessee entered into an agreement with Roswell T. Hapgood, giving Hapgood the right to extract gasoline from gas derived from said property and accepting 1/3 of said gasoline in return, with the proviso that "in addition thereto one-half (½) of any royalty on said gasoline recovery that the said party of the first part may be obliged to pay to the land owners, but in no event shall such royalty be computed on a basis greater than one-eighth (⅛) of the total gasoline recovered." Some time after this agreement, Hapgood sent his attorney, W. E. R. Byrne, to Philadelphia, to

secure a site on said leased premises on which to erect a gaso-line plant. An agreement was reached with a representative of the Bowers estate for such site containing three acres, at an annual rental of $75. On the attorney's return to Char-leston, he prepared a written lease embodying the terms of the verbal agreement made in Philadelphia. This lease was mailed to the Bowers' representative, and on October 23, 1918, with some minor changes, was executed by Charles C. Bowers, for the Bowers corporation, in Charleston, under cir-cumstances referred to later in this opinion. Hapgood con-structed a gasoline plant on the site so acquired and began the operation thereof on July 16, 1919, and was producing gasoline under the terms of his agreement at the time of the institution of this suit on July 21, 1920.

In this suit the claim is asserted by the plaintiff of a right to share in the gasoline made from the gas produced from the leased territory. The lease of 1912 contains no provision regarding the rights of the parties with respect to such gaso-line, and the plaintiff's claim is based not on the lease but solely upon a contract made by correspondence between the parties, set out hereinafter at length. The plaintiff seeks not only an accounting for and a share in this gasoline in accordance with the contract, but, in addition, avers various breaches of the provisions of the lease on the part of the lessee, on account of which it asks that the lease be cancelled.

The cause resolves itself into two issues. The principal one is, whether the contract for a division of the gasoline between the plaintiff and the defendant company was made and is binding on the defendant. The other, whether the defendant, as lessee, has so violated the covenants of the lease by failing to properly develop the leasehold and protect it from drain-age by offset wells, and to save and market the oil produced from the premises, that the lease should be cancelled.

Did the letters, communications and actions of the parties, shown in the evidence constitute a binding contract as to a division of or payment for gasoline produced from the plain-tiff's lands? Embraced in this main inquiry are two ques-tions, either one of which is controlling on the issue: (1) was there a contract; and (2) if so, was it authorized or rati-

fied by the defendant corporation? A determination of the
first question may render a consideration of the second un-
important; for, if there was no binding contract for the gaso-
line, then it is immaterial whether Thomas had authority to
make the contract, and it is unnecessary to consider ratifica-
tion of a contract which does not exist.

The parties to this correspondence were George E. Thomas,
secretary and treasurer of the defendant corporation, on the
one hand, and Thomas E. Merchant, attorney in fact for the
Bowers' estate, and later Charles C. Bowers, president of The
Bowers Company, incorporated, on the other. Between Au-
gust 3, 1918, and October 22, 1918, the latter date being that
of the arrival of Charles C. Bowers in Charleston, Thomas
and Merchant and Bowers dealt with each other only by let-
ter or wire. Thomas lived in Charleston, West Virginia,
Merchant and Bowers at Philadelphia, Pa. On the first men-
tioned date, Thomas wrote Merchant a letter, which the plain-
tiff claims constitutes the offer in the case. As it is important,
we will quote it in full, omitting the caption and ending:

> "We are writing to you as the representative of
> the Bowers heirs—now we believe incorporated—
> with reference to the property we have leased from
> them.
>
> "As you are aware, some late improvements
> have shown the practicability of extracting gaso-
> line from natural gas before using it for fuel. We
> have this matter up with a party who is willing
> to put up a plant for this purpose, and offers for
> 64 per cent of the gasoline extracted from the gas,
> to turn over to us the remaining 36 per cent of the
> gasoline extracted; the percentage taken by him
> representing the cost of saving the gasoline.
>
> "As in our opinion such gasoline delivered to us
> would in its nature be oil produced, we think our
> lessors entitled to one-eighth thereof. The gaso-
> line produced from this lease we think will produce
> in this way a considerable revenue both to the Bow-
> ers and to ourselves, which otherwise is necessarily
> lost.
>
> "For the purposes of saving this gasoline, it is
> necessary to build a plant, and as we are not quite
> sure the rights under our lease give us this privi-

lege, we are writing you to learn whether the Bowers would consent to the location of the necessary plant on the Bowers lease.

"This would only require a small amount of surface somewhere back in the woods which is absolutely of no value to anyone. More than likely it will be a piece of surface up what is known as Horse Mill Hollow.

"We will be obliged if you will let us know as early as possible whether an agreement along this line will be satisfactory to your clients, as the man making us this proposition is anxious to start in time to complete the plant before frost, so that it will be necessary for us to act at once.

"If you advise us favorable, we will have a brief memorandum prepared along these lines and also a plat showing the location of this plant."

It will be noted that negotiations were already pending with another (Hapgood) for the extraction of the gasoline products from the gas, and that an early reply was requested. Two weeks later, August 17th, Merchant wrote as follows:

"The subject matter of your letter of the 3rd inst., extraction of gasoline from natural gas, is under consideration, pending which it is suggested that you name the most that would be allowed the Bowers side, the impression being that one-eighth is too small a proportion. I would suggest an early response so that the Bowers side may be fully advised as to the proposal."

It is clear that there was no acceptance here. On September 10th, Thomas made reply:

"Replying to your favor of August 17th, beg to advise that your letter was received while I was away on a vacation and I referred the matter back to Mr. Fields, Pres., of Kanawha Valley Products Co., requesting him to correspond with you further in regard to the gasoline question, but upon my return yesterday *I learned that he had pigeon holed the matter and that you had received no reply to your letter of the 17th ult.*

"Referring to your inquiry as to whether or not the proposition as outlined to you in my letter of

Aug. 3rd, would be the best we could do, viz. ⅛ of the net proceeds derived by the Kanawha Valley Products Co., will say that this is the ratio set out in the lease and is the proportion prevailing in all the oil and gasoline productions that I know of, and would be the best we could possibly allow.

*"In fact we think it is a debatable question whether or not the Bowers Estate is entitled to any royalty from this particular source, since we pay them a fixed price of ½c per thousand for all gas produced and this being a by-product from natural gas which the Kanawha Valley Products Co., buy and pay for when they pay a ½c royalty on all gas produced."*

Notwithstanding, Thomas had requested prompt action in both of his former communications, no reply was made, until Bowers, on October 17th, wired:

"Bowers Company now operative believe can get prompt action directors on gasoline proposition on basis one-eighth total gasoline stop wire and mail me draft contract."

Here is plainly a counter-proposition to the offer of Thomas made in the telegram. Reading it in the light of the prior communications between the parties, it said in effect, your proposition of one-eighth of 36 per cent of the gasoline is rejected; we (Bowers) offer you (Thomas) a contract on condition that we get one-eighth of the total gasoline produced from the lease. A counter proposition made by the person to whom the offer is addressed, according to the great weight of authority, operates as a rejection of the original offer. Mechem on Sales, Sec. 229; Elliott on Contr., Sec. 45; Page on Contr., Sec. 46; 9 Cyc. 290.

The law is that a party to whom an offer is made is at liberty to accept wholly, or to reject wholly, but one of these things he must do. A proposition to accept on terms varying from those offered is a rejection of the offer, and a substitution in its place of the counter proposition. It puts an end to the negotiation so far as the original offer is concerned. The original offer loses its vitality, and is no longer pending between the parties. *Turner* v. *McCormick,* 56 W.

Va. 161; *Weaver* v. *Burr*, 31 W. Va. 936; *Kileen* v. *Kennedy*, 90 Minn. 414; *Egger* v. *Nesbitt*, 122 Mo. 667. The situation is then as if the original offer had not been made, so far as any rights or liabilities can arise therefrom. *Davis* v. *Parish*, Litt. Sel. Cas. (Ky.) 153; 12 Am. Dec. 287. In order to give the rejected offer any new vitality, there must be a renewal of it, or renewed assent to it, by the party who made it. *Sheffield Canal Co.* v. *Sheffield R. R. Co.*, 3 Eng. Ry. & C. Cas. 121. The revival of the offer, however, is an essential part of the contract, and it must be proven as a substantive fact. *Lewis* v. *Johnson*, 123 Minn. 409. Has there been such assent shown here on the part of Thomas?

The parties so far had been dealing at long range. Bowers came to Charleston on October 21st. The last scene in this drama was enacted here. In the light of the well established principles of law just announced let us consider what occurred between the parties. Bowers executed a contract with Hapgood, leasing him a site for a gasoline plant. Nothing was said in this lease about gasoline rights. It was executed on October 23rd. This is testified to by Hapgood and Thomas and the original lease introduced in evidence—upon being required on the trial to produce it—by Bowers, is a silent and potent witness to this fact. The certificate of the Notary Public says that Bowers acknowledged it on October 23rd. Bowers alone claims it was not executed until the 26th day of October. This is vital on the question of whether there was a contract, as we will later show. Up to the time of the execution of the Hapgood contract there had been no renewal of the negotiations between Thomas and Bowers. What was Bowers' attitude toward the gasoline proposition made by Thomas? Let the record speak. Two days before Bowers left his home in New Jersey for West Virginia, and two days after the date of the telegram, his corporation adopted a resolution empowering him to proceed to this state and "accept the proposition of Kanawha Products Company of August 3, *if in his judgment it seemed practicable,* and conclude a lease for site of the gasoline plant." (A fact of which Thomas had no knowledge.) This establishes the frame of mind that Bowers was in as to the gasoline proposition when he came to

this state. · Was there a change? Not at least for three days, for we find him stating: "On the 24th of October, I visited Mr. H. A. Wallace, of the United Fuel Company. Mr. Wallace gave me a great deal of authentic information, and it satisfied me that I would have a law suit on my hands if I stood out for the one-eighth total amount of the gasoline. * * * On the 25th of October, having made up my mind as to what I would do, I again visited Mr. Hapgood's office, and had the stenographer write out the final draft of acceptance letter. * * * A meeting on the evening of October was then arranged. We discussed this letter of acceptance and agreed that it covered the ground. Mr. Hapgood got two large plain envelopes from the other room, where his stenographer was, and I placed the original in one envelope and handed it to Mr. Thomas and he put it in his outside coat pocket. * * * On the morning of October 26th, I went around to Mr. Hapgood's office and read over the lease for site for gasoline plant as he had drawn it and signed it."

The alleged letter of acceptance, dated October 25th, follows:

"Re your proposal to extract gasoline from the natural or dry gas from the Bowers land.

"We have to inform you that the Bowers Company is now incorporated under the laws of West Virginia and is the owner of all lands, rights, titles and interests, etc., in West Virginia formerly belonging to the estate of the late William Bowers.

"We accept your proposal dated August 3, 1918, addressed to Thos. E. Merchant, Philadelphia, Pa., then attorney for the Bowers' estate, you to enter into contract with responsible parties for the extraction of gasoline from the natural or dry gas which you obtain from the Bowers land under contract of March 1st, 1912.

"The operation is to be carried on in a thoroughly practical manner, and so as not to interfere to an appreciable extent with volume, pressure or market value of the natural gas.

"Of the total gasoline thus extracted, 64 per cent remains to cover the cost of the operation, 36 per cent goes to the Kanawha Valley Products

Company as lessees and operators of the gas rights, and The Kanawha Valley Products Company shall deliver to The Bowers Company as owners, one-eighth ($\frac{1}{8}$) of their 36 per cent of the gasoline, or shall pay quarterly to The Bowers Company the equivalent market price, as the Bowers Company may elect.

"The meters, measurements, etc., are to be to the satisfaction of The Bowers Company, and together with the books, records, data, etc., of The Kanawha Valley Products Company and the parties extracting the gasoline, are to be always open for the inspection of The Bowers Company or its representatives."

Both Mr. Thomas and Mr. Hapgood testify that on October 23rd in Mr. Hapgood's office, immediately after the lease was signed and acknowledged by both parties, Mr. Bowers turned to Mr. Thomas and said, "Mr. Thomas, what about our negotiations?" that Mr. Thomas said, "It is all off", and proceeded to explain to Mr. Bowers that the local stockholders had disposed of their holdings to Mr. Cabot and advised Mr. Bowers that he would have to take the matter up with Mr. Cabot; that Mr. Bowers then hesitated for a moment and said, "I will tell you what I will do. I will write you a letter accepting your original proposition," and that Mr. Thomas then stated to Mr. Bowers that he might just as well write a letter to himself, that it wouldn't do him any good. Thomas testifies that he received the letter of acceptance a few days after its date in the mail. The dates of the two important instruments—letter of acceptance and the contract for the gasoline site—mutely sustain Hapgood and Thomas in their version of the matter. Bowers attempted to explain why the latter paper bore the date it did. He said that he remembered "discussing with the notary and in the presence of Hapgood the question of variance in the dates, and we concluded that it was a matter of no importance and did not alter it." Both Hapgood and the notary entered an emphatic denial that such conversation was ever had concerning it and averred that the instrument was acknowledged by Bowers on the day that it imported to be executed.

It will also be noted that the letter of August 3rd states as. follows:

> "If you advise us favorably, we will have a brief memorandum prepared along these lines and also a plat showing the location of this plant."

and that the telegram of October 17th, states as follows:

> "Wire and mail me draft contract."

This clearly shows that both Bowers and Thomas contem-- plated and expected that if any agreement regarding the gasoline proposition was reached the same would be incor- porated in a written agreement or contract and signed by both parties. The telegram, under well settled rules of law,. as we have already stated, is a rejection of the offer of August 3rd, and put an end to the negotiation, unless the party who made the original offer renews it or assents to the modifica-- tion. Bowers having once rejected the offer, cannot after- ward revive it by tendering an acceptance of it. After the intervening correspondence, varying from the original offer of August 3rd, the plaintiff cannot, by writing a letter ac- cepting its terms, make a binding contract, without some re- newed assent thereto on the part of Thomas. *Eliason* v. *Hen-- shaw*, 4 Wheat. 225; *Carr* v. *Duvall*, 14 Peters, 77; *Nat'l Bank* v. *Hall*, 101 U. S. 43; *Hude* v. *Wrench*, 3 Beaven 334; *Fox* v.. *Turner*, 1 Bradwell (Ill.) 153; *Minneapolis, etc., R. Co.* v.. *Rolling Mill*, 119 U. S. 149. To show a renewal by Thomas. of the offer of August 3rd, Bowers has the laboring oar. Not. only has he failed to bear the burden cast upon him, but from all the facts and circumstances surrounding the transaction we are forced to the conclusion that in playing for higher stakes he lost all. Not until he was advised by a friend well versed in the oil business that the gasoline matter "had never been decided satisfactorily in the courts" did his attitude change. To escape, then, the effect of his having executed the gasoline site contract without reference to the royalty claimed by him, and in his attempt to show an acceptance (by letter—

doubtless an afterthought) of the original proposition of August 3rd, 1918, he was called upon to discredit the date of his acknowledgement of the former. We prefer to cast aside both interested parties on this matter and accept the sworn statement of the officer as the truth. At the time he executed the lease for the gasoline site, it may be fairly inferred that he had not yet made up his mind whether he would accept less than one-eighth of the total output of gasoline. Bowers' subsequent conduct speaks likewise against his contentions. His letters to Hapgood and the defendant company contained no reference to the interest he expected to obtain from the manufacture of gasoline from the lease. The first reference made to such contract was in January, 1920. It is incredible that a business man would write a letter under the circumstances detailed by Bowers accepting a proposition and then wait over a year before making any attempt to ascertain whether the corporation had accepted it. We hold that no contract was ever made between the parties. It accordingly becomes unnecessary to consider the other question of ratification.

The remaining issue for consideration is that involving the forfeiture of the lease. This phase of the case received but scant consideration, either in briefs or counsel, or in argument at the hearing. Generally, as our cases hold, after a lessee has fulfilled all the specific covenants and conditions of the lease, and has thereby become invested with an estate or interest in the land, work of further development is, in the absence of specific covenants to the contrary, referred to the sound judgment and reasonable discretion of the lessee exercised for the mutual benefit of the parties to the contract, and, in the absence of proof of great abuse of such discretion or of actual fraud, his omission to fully operate the premises, affords no grounds for complete or partial cancellation. *Hall* v. *South Penn Oil Co.*, 71 W. Va. 82; *Allen* v. *Oil Co.*, 92 W. Va. 689. The plaintiff failed to sustain by a preponderance of the evidence the charges made in his bill against the defendant company, of failure to conserve the oil produced from certain wells drilled on the premises; that the development of the Tompkins tract was pushed at the expense of the Bowers lease; and that there was substantial

drainage from the Bowers lease by wells on adjoining leases.

Our conclusion is, from a careful consideration of the whole record, that there is not presented here a case, justifying a cancellation of the lease in question.

*Affirmed.*