### HOFFSTOT v. DICKINSON et al.
#### Civil Action No. 641.

District Court, S. D. West Virginia.
April 30, 1947.

898

Reed, Smith, Shaw & McClay, of Pittsburgh, Pa. (by John B. Gordon, of Pittsburgh, Pa.), and Steptoe & Johnson, of Charleston, W. Va. (by Robert W. Lawson, Jr., of Charleston, W. Va.), for plaintiff.

Payne, Minor & Ray, of Charleston, W. Va. (John V. Ray, of Charleston, W. Va.), for defendants John L. Dickinson and Maude H. Dickinson, his wife.

Townsend & Townsend, of Charleston, W. Va. (by Hillis V. Townsend, of Charleston, W. Va.), for defendants J. N. Berthy, Jr., and Rose H. Berthy, his wife.

Campbell, McClintic & James, of Charleston, W. Va. (by J. Hunter McClintic, of Charleston, W. Va.), for defendants T. J. Blair and Emma D. Blair, his wife.

MOORE, District Judge.

Plaintiff, has brought an action against defendants in which he alleges that defendants agreed to convey to him a tract of approximately 400 acres of land in Nicholas County, West Virginia, containing 197 acres of coal, and being part of a large boundary of several thousand acres owned by defendants, at the price of $100 per acre, based on coal acreage alone, or $19,700. He alleges further that he expended $10,000 in tests and improvements on the land in reliance upon the alleged agreement to convey. He further alleges that the property is worth $226,200. He charges that defendants have refused to convey the property, and by this action he asks for a decree of specific performance of the alleged agreement to convey, or in the alternative, a money judgment for $216,500.

Defendants deny that any enforceable agreement was made to convey the property; that plaintiff spent any money in tests or improvements in reliance upon any agreement to convey; and say that they are without knowledge or information sufficient to form a belief as to plaintiff's allegation concerning the value of the property. Defendants and each of them also set up the defense of the Statute of Frauds of West Virginia, being Section 3 of Article 1 of Chapter 36 of the Code of West Virginia.

The Court, sitting without a jury, heard the evidence in the case in a trial which consumed three days. All the parties to the suit (excluding the wives) testified, with the exception of John L. Dickinson, who was at the time and had been for some months prior thereto in a state of ill health, which was such that his physician would not permit him to attend the hearing. Other witnesses also testified, and numerous exhibits were filed.

From all the evidence and exhibits the Court finds the facts in the case to be as follows:

Plaintiff is a Pennsylvania coal operator, who, shortly prior to August, 1943, through a conversation with defendant Berthy, became interested in acquiring a boundary of coal in Nicholas County, West Virginia, for the purpose of developing, mining and operating a coal mine thereon. At that time, the property in controversy was owned by a corporation named Muddlety Coal Land Company, the sole stockholders and directors of which company were Blair, Berthy and Dickinson.

On August 7, 1943, defendant T. J. Blair, Jr., wrote the following letter to plaintiff:

"Mr. J. N. Berthy, Jr. has requested me to furnish you information and a price on the coal in the section East of Laurel Fork and South of Muddlety Creek as shown colored orange on the attached sketch.

This is a part of the Muddlety Coal Land Company's tract.

"The coal sections and analysis were furnished to me by J. N. Berthy, Jr. and have not been verified. You will of course want to have checked all information furnished.

"The price per acre for the land needed for operations and the coal is $100.00. This includes the lower and upper seams, which have been opened and which you have seen, and a third seam above the two that has not been prospected but may exist.

"If you desire to lease instead of purchase, that can be arranged under a proper lease at twelve cents per ton of coal.

"If you are interested in either proposal, you may advise me and the matter will be presented to the Board of Directors for approval."

During the period from August 7, 1943, to September 11, 1944, a few letters were exchanged between plaintiff and Blair and between plaintiff and Berthy with reference to the property which will not be quoted here, but which indicated that plaintiff maintained his interest in making the purchase, and that these two defendants continued to be interested in making the sale.

On September 13, 1944, plaintiff had a meeting with Blair, Berthy and Dickinson at Charleston, at which meeting plaintiff expressed his willingness to purchase the property, and asked permission to be allowed to prospect it by core drilling, and in any other way he cared to do. He was given permission to do so with the understanding that his prospecting and testing should be at his own expense. Between that time and December 7, 1944, plaintiff made extensive tests and spent a large sum of money in the effort to satisfy himself that the coal on the property suited his requirements.

On December 7, 1944, the same parties, namely, plaintiff and defendants Blair, Berthy and Dickinson again met in Charleston, at which time plaintiff stated that he was ready to buy the coal that he had tested. He was informed by Dickinson that the sale could not be then discussed, because the stockholders of Muddlety Coal Land Company were about to dissolve the Corporation, after which dissolution the land would be owned by Blair, Berthy and Dickinson as co-tenants, and that they had been advised that they should do nothing about any sale until six months after December 29, 1944, the date of liquidation of the Corporation. Plaintiff inquired as to whom he should then deal with respecting the sale of the land, and Dickinson and Berthy told him that he should deal with Blair.

Apparently all parties waited for six months to expire before resuming negotiations, for on July 2, 1945, a form of deed was prepared, and mailed to plaintiff by Blair on July 6, 1945. This proposed deed would have conveyed "all the coal in the Tioga Seam and all the other coal that lies above at a higher elevation than the said Tioga Seam, which is contained within the following boundary of land" (describing the land as containing 207 acres more or less, with the boundary of the coal outcrop, and granting mining privileges in the surface, together with certain timber, sand, gravel, stone and water rights). It was accompanied by a memorandum addressed to plaintiff and initialed by Blair reading as follows:

"Attached is copy of pro. deed. If you have any suggestions pass them along to us. The part in deed describing granting easement will have to be changed to meet your requirements."

This deed was not satisfactory to plaintiff, so he arranged to meet Blair, Berthy and Dickinson again, and on August 1, 1945, such a meeting took place in Charleston. In this meeting plaintiff stated in effect that his understanding was that he was to get from defendants not only the coal in place on the property, together with mining rights in the surface, but was to have fee simple title to all the land included within the boundary, containing approximately 400 acres, which was above the level of the waters of Muddlety Creek, and was to pay for it on the basis of $100 per acre for the coal acreage alone. Dickinson thereupon stated that he had never heard of any contention on the part of plaintiff that the proposed sale included any surface, nor that there had been discussion

at any time with him which would indicate to him that the transaction involved "all the coal above the water level of Muddlety Creek." Dickinson then left the meeting and a few days thereafter was taken seriously ill, from which illness he had not recovered at the time of the trial.

On August 14 Blair again sent to plaintiff the form of a proposed deed which would convey to "Penncoal, Inc." (evidently a corporation which plaintiff intended to organize), the coal above a certain named seam in the 400 acre tract in controversy, together with surface rights in the entire tract as to mining, timber, etc., which varied in some particulars from those set out in the form originally submitted. This form of deed was also refused by plaintiff in a letter to Blair of August 17, which contained this statement, among others:

"The proposed deed submitted with your letter of the 14th may be in line with our conversation in Charleston, but for the reason given in my letter of August 6, I still feel definitely that our agreement should be lived up to and I should receive a deed in fee for the land as described in this latest edition without reservations, and all the coal above the level of Muddlety Creek."

It is to be noted that this last mentioned form of deed, while describing the 400 acre tract, concluded the description with a statement that it contained 207 acres, more or less. This was evidently a clerical error. On October 18, 1945, a third proposed form of deed was mailed to plaintiff by Blair. This deed is merely a redraft of the one sent to plaintiff on August 14, 1945, with the clerical error corrected; that is to say, after the description of the property it is stated that the property contains 197 acres of coal, more or less, and that the surface contains 417 acres, more or less. Plaintiff rejected this deed, also.

On November 26, 1945, a meeting took place at Summersville, West Virginia, between Blair, Berthy and plaintiff. At this meeting Blair asked plaintiff to relate "just exactly what he wanted" and in response, plaintiff stated that he wanted to purchase the 197 acres of coal with all of the surface on Laurel, which was between Laurel Fork and defendants' property line on the east and south, and a line parallel with the Stroud's Creek and Muddlety Railroad.

On January 22, 1946, Blair wrote plaintiff to the effect that a fourth deed had been prepared and sent to one Fred Sarles (Dickinson's secretary) for his approval before forwarding it to plaintiff. On February 18 this form of deed was mailed by Blair to plaintiff, and plaintiff acknowledged it on February 19 with the statement that he would see his counsel. Since it is this last mentioned form of a proposed deed which figures largely in the contentions of all the parties, it will be referred to hereinafter, for the sake of brevity, as the "Blair" deed.

In the Blair deed, for the first time, the granting clause, instead of conveying merely the coal, with mining and other rights in the surface, conveys the land itself in fee simple above an elevation of 2005 feet, with a reservation of the title below that elevation, together with reservations to the proposed grantors of surface rights to them for mining and developing the minerals which might be found to exist at a lower elevation than 2005 feet.

The provisions of the Blair deed still failed altogether to satisfy plaintiff, and plaintiff was also having negotiations with Blair, Berthy and Dickinson concerning some adjoining land of theirs, and wished to close both deals at the same time. He wrote Blair a letter on March 26, 1946, in which he said among other things:

"I have not taken the deed up as yet for I want to take both matters up at the same time."

A few other letters passed between plaintiff and Blair, in none of which plaintiff indicated that he would accept the Blair deed, and on May 22, 1946, Blair wrote plaintiff as follows:

"I am trying to arrange to get Mr. Berthy to come to Charleston on Monday, May 27th, to meet with Mr. Dickinson and me, and if possible I would like for you to arrange to be here on that date and we will endeavor to complete the negotiations with you."

Plaintiff did come to Charleston on May 27.

Defendants' counsel in the prior negotiations had been J. E. Campbell, of Charleston. At the time plaintiff came to Charleston, Campbell was ill. Blair telephoned J. Hunter McClintic, of the law firm of Campbell, McClintic & James, who had not previously had any familiarity with the transaction, and asked McClintic to be present at the meeting with plaintiff. Blair told McClintic that since the preparation of the Blair deed some changes had occurred which made it desirable for the proposed grantors in the Blair deed to obtain an additional reservation or right of way over the surface proposed to be conveyed by that deed which would give them an outlet for the transportation of coal which they expected to produce from their adjoining property.

On May 27 plaintiff, accompanied by his son, his attorney Hoge, and one George E. Steele, came to Blair's office in Charleston, where Blair and McClintic were waiting for him. After exchanging greetings, Hoge handed Blair a paper and plaintiff stated in effect that he would take or buy the property in accordance with the terms set out in the paper. This paper will be referred to hereafter as the "Hoffstot" deed. It was a form of deed similar in many respects to the Blair deed, but with some important variations, which may be briefly stated as follows:

1. The Blair deed conveyed all the land above 2005 feet elevation; the Hoffstot deed conveyed all above 2000 feet elevation.

2. The Hoffstot deed gave plaintiff extensive rights over the adjoining land of the grantors; the Blair deed gave no rights of any kind in the adjoining land.

3. The Blair deed reserved fee simple title to all land below 2005 feet; the Hoffstot deed omitted any such reservation. This is an immaterial variation, inasmuch as the conveyance of land above the named elevation would necessarily exclude land below that point.

4. The Blair deed reserved to the grantors mining rights in the surface, which were to be used so as not to *unreasonably* interfere with grantee's mining operations; the Hoffstot deed provided that such rights should be exercised so as not to interfere with the *full use* and possession of the land by the grantee.

5. The Hoffstot deed provided for payment of 12¢ a ton for any coal required to be left in the land as a result of the exercise by the grantors of any of the rights reserved, and that the grantors should pay all taxes on any part of the surface used by them; which provisions are not included in the Blair deed.

Berthy joined the group and all went to the office of Dickinson, where McClintic told Dickinson that a new form of deed had been presented by plaintiff. Plaintiff and his associates were requested to retire, and while they were absent Blair, Berthy and Dickinson, after some discussion, decided to reject the Hoffstot deed. They did so on advice of McClintic, who informed them that in his opinion the Hoffstot deed constituted a counter-offer, and therefore a rejection of the Blair deed. They were all the more ready to reject what they were advised was a counter-offer because of their desire to obtain a right of way over the surface for transportation of coal from their adjoining lands as one of the conditions of the purchase and sale being negotiated.

McClintic then told Hoge, as counsel for plaintiff, that the Hoffstot deed was rejected, and that the only basis on which his clients would deal was the Blair deed, with the addition of the reservation of the right of way to the grantors over the surface.

The interested parties continued negotiations during all the rest of that day, May 27, and part of the following day, May 28. They were unable to reach an agreement concerning the right of way which Blair, Berthy and Dickinson insisted upon as part of the transaction. On the afternoon of May 28 plaintiff delivered to Blair, Berthy and Dickinson a letter which had been prepared by his counsel the night before, in which he formally agreed to accept the Blair deed, and offered to pay the sum of $19,700 to close the transaction. Blair, Berthy and Dickinson refused to comply with the terms of plaintiff's formal letter and the meeting broke up. Thereafter a form of deed was mailed to plaintiff on

902

June 11, 1946, together with a formal offer signed by T. J. Blair, Jr., that this deed would be executed and delivered upon payment of $19,700 in cash. It is virtually the same as the Blair deed, except that surface rights are reserved to the grantors for the purpose of developing, mining and removing minerals from any and all other lands of the grantors as well as the land within the boundary conveyed below 2005 feet elevation; and nothing is said as to interference by defendants, in the exercise of mining rights, with grantee's operations in removing the coal conveyed to him.

I now proceed to examine the successive steps in the negotiations to determine when, if at all, an offer was made and accepted, so as to bind defendants to performance thereof; and, as a corollary to this inquiry, whether there was any offer open for acceptance on May 28, 1946, the date when plaintiff delivered to defendants his formal letter accepting the Blair deed.

■ Blair's letter of August 7, 1943, was not an offer. It was merely a proposal that plaintiff make an offer, which, if made, would be presented by Blair "to the Board of Directors for approval." See Restatement of Contracts, sec. 25; Guyandotte Coal Co. v. Virginian Electric & Machine Works, 1923, 94 W.Va. 300, 118 S.E. 512.

■ The permission given plaintiff on September 13, 1944, to prospect by core drilling added nothing to plaintiff's rights, insofar as purchase of the land was concerned. He still had made no offer to purchase the land, and the Muddlety Coal Land Company, by its Board of Directors, could still have refused to accept an offer, if later made.

Plaintiff, on December 7, 1944, for the first time, made an offer "to buy the coal that he had tested." This offer was not entertained or acted on by the defendants composing the Board of Directors of the Company. On the contrary, plaintiff was told 'that it could not be talked about at that time, because of the impending dissolution of the corporation, and the advice of counsel that no sales should be considered until six months after the date of liquidation. Evidently there was no mu-

tuality of understanding at this time with respect to just what plaintiff proposed to buy. He understood Blair's letter of August 7, 1943, to mean that the corporation would entertain an offer to purchase the coal in two (or possibly three) seams, *together with* land needed for operations, at the price of $100 per acre, *based on coal acreage alone*. Blair, Berthy and Dickinson understood (as I gather from circumstances later referred to) that purchase of the coal at the acreage price would carry with it *only mining rights* in the surface. As to necessity of mutual assent see Hancock v. Fletcher, 1933, 113 W.Va. 624, 169 S.E. 457; Martin v. Ewing, 1932, 112 W.Va. 332, 164 S.E. 859; Meadows v. American Eagle Fire Ins. Co., 1927, 104 W.Va. 580, 140 S.E. 552; Parks v. Morris, etc., Co., 1907, 63 W.Va. 51, 59 S.E. 753.

The circumstances which show that this was the understanding of Blair, Berthy and Dickinson, aside from the oral testimony of Blair and Berthy, are the series of letters and telegrams which passed between the parties from December 7, 1944, to August 1, 1945, particularly the first form of deed, sent by Blair to plaintiff on July 6, 1945. This form of deed purported to include in its terms nothing more than the coal in the upper seams, *and mining rights in the surface overlying that particular coal*. Since plaintiff refused to accept such a deed, there was certainly as yet no binding contract. Even if it were assumed, *arguendo*, that Blair and Berthy understood plaintiff's offer to be as plaintiff understood it, there was no obligation on their part to accept it as made.

At the meeting on August 1, 1945, plaintiff made known to Blair, Berthy and Dickinson, *for the first time*, that he expected to get fee simple title to all the 400 acre tract above the water level of Muddlety Creek, paying for it on the basis of $100 an acre, measured by the coal acreage alone. Dickinson flatly refused this proposition. The evidence does not disclose what the attitude of Blair and Berthy was towards it. At any rate, there was no agreement reached with them at that meeting. Plaintiff's counsel asked him on the stand: "Did you gentlemen come to any agreement at that afternoon meeting?" to which question

he replied: "None." I infer that they were not at that time favorable to a conveyance of any surface, though willing to extend the scope of the mining rights, from the fact that a few days later a second form of deed was submitted to plaintiff by Blair (later corrected as to calculation of acreage) by which plaintiff would have received the coal, *with mining rights only* in the entire tract.

It was not until plaintiff's proposition had reiterated to Blair and Berthy, on November 26, 1945, at the meeting between them at Summersville, that anything was done which would indicate even a qualified acceptance of plaintiff's proposal that defendants should convey to him the coal and the entire 400 acres of surface for the sum of $19,700. A little less than two months after that time, the Blair deed was written, and later mailed to plaintiff.

But did the Blair deed constitute an acceptance of plaintiff's offer, so as to impose any binding obligation on Blair and Berthy? It is well settled that unless an acceptance conforms exactly to the terms of the offer—if it is qualified in any particular and such qualification is not implicit in the offer itself—then such a qualified acceptance creates no contract, but amounts to nothing more than a counter offer. Restatement of Contracts, sec. 58 et seq.; Hancock v. Fletcher, supra; Weaver v. Burr, 1888, 31 W.Va. 736, 8 S.E. 743, 3 L.R.A. 94.

It is my opinion that plaintiff's offer to buy the coal above a certain level, together with the entire surface of the tract, was subject only to the implied condition that the grantors should have the right to reserve necessary mining rights in the surface for developing and removing whatever minerals might exist in the land below the level of the coal bought, but no more. See Porter v. Mack Manufacturing Co., 1909, 65 W.Va. 636, 64 S.E. 853. The question arises: What is the extent of such necessary mining rights? Ownership by different individuals of successive underlying and overlying strata of minerals, all of which underlie the same surface, creates a difficult problem respecting mining rights, and this problem has been the subject of some confusion on the part of the courts. In Jefferson Iron Works v. Gill Bros., 9 Ohio Dec. Reprint 481, the facts were that a freehold estate had been conveyed in the coal without reservation to the grantors of rights to drill for oil and gas. Ultimately the surface owners leased the property for the purpose of gas exploitation. The Court held that the lessee of the surface owners did not have even a way of necessity to reach gas under the coal by sinking a well through the mines.

Such a strict construction regarding implied reservations for the benefit of a grantor has been modified somewhat by other and later cases, the most notable of which is that of Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 A. 597, 18 L. R.A. 702, 34 Am.St.Rep. 645. The facts in that case were as follows:

Plaintiff owned the coal in certain lands, having acquired it by a deed which conveyed various mining rights and privileges in the surface. The grantor reserved no right of way through the coal strata from the surface to mine or drill for any substance which might exist below the coal. The surface owner executed leases for oil and gas purposes and the lessees began to drill wells. Plaintiff sought an injunction to restrain the drilling. The lower Court refused the injunction as requested by plaintiff on the theory that the surface owner had a right of way by necessity through the coal to reach the oil and gas lying under it; but the oil and gas lessees were required to execute bonds to indemnify the owner of the coal for any damage which might result from the oil and gas operations. This decision was affirmed. The Appellate Court recognized the right of the surface owner "to reach, in some way his underlying strata," but said, "The right may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining, and for every necessary interference with it the surface owner must respond in damages." In a concurring opinion in this case Mr. Justice Williams said: "I would lay down the broad proposition that the several layers or strata composing the earth's crust are, by virtue of

their order and arrangement, subject to reciprocal servitudes; * * *." Lindley, in his work on Mines, agrees with Justice Williams and makes this observation: "Each overlying stratum would have the right of support from the lower; all being under a common servitude to the surface owner, and each owner would owe a duty to the other to so conduct his operations as to not interfere with his over or underlying neighbor." 3 Lindley on Mines, sec. 827.

I am of opinion, which I believe is in general agreement with the Chartiers case, that the implied rights of the grantors in the Blair deed, if they had merely accepted plaintiff's offer as made, would have been limited to the extent that they should not interfere with plaintiff's operations, or his use of the land for purposes known to the defendants. But the offer was not accepted as made. Reservations such as those in the Blair deed, which prohibited only *unreasonable* interference, were not implicit in plaintiff's offer, since such reservations necessarily contemplate some interference. A grantor's implied rights in such a situation spring from the law of real property relating to easements of necessity. In Tiffany on Real Property, Vol. 3, 3rd Ed., sec. 792 et seq., the following discussion concerning easements of necessity appears:

"An easement of necessity, so called, is an easement which arises upon a conveyance of land, in favor of either the grantor or grantee of the land, by reason of a construction placed upon the language of the conveyance in accordance with what appears to be the necessity of the case, in order that the land conveyed, or sometimes, the land retained, may be properly available for use. * * * If one conveys minerals beneath his land, the grantee may be entitled, on the same theory of necessity, to the privilege of building air shafts and water storage facilities, of erecting machinery in or on the grantor's land, and of dumping waste thereon.

" * * * the courts, in pursuance of considerations of public policy favorable to the full utilization of the land, and in accordance with the presumable intention of the parties that the land shall not be without any means of access thereto, have established this rule of construction that, in the absence of indications of a contrary intention, the conveyance of the land shall in such case be regarded as vesting in the grantee a right of way across the grantor's land. * * *

"Since the grant or reservation of a way of necessity is implied merely to accord with the presumed intention of the parties, such an implication may be excluded by particular language in the conveyance. * * * It might also be excluded, it seems, by evidence of extrinsic facts. * * * And so if land is conveyed with an explicit understanding that it is to be covered by a building, it could not well be contended that the grantor had a right of way of necessity through the building.

"While it is not essential that the necessity upon which the right of way is based shall be an absolute physical necessity, it is necessary that it be a reasonable necessity, or, as it has been said, that the necessity be 'actual, real and reasonable.' "

With reference to whether reservation of *any* coal mining rights was implied in plaintiff's offer, can we say that the necessity for such rights was "actual, real and reasonable," or that the presumed intention of the parties contemplated reservations such as were expressed in the Blair deed? I think not. If there is any coal in that part of the land below 2005 feet elevation it is farther from the surface of that land than it is from the surface of defendants' adjoining land. Coal exists in horizontal strata or seams, and is not confined to pockets which might underlie the boundary in question here and not extend across the boundary line to defendants' other land. Coal is rarely mined in this State by shaft methods, and even if it were, any coal underlying the 400 acres which was below 2005 feet elevation could be more easily reached by a shaft sunk on the grantors' adjoining property than by a similar shaft sunk on the 400 acres, since the vertical distance would be less.

"A way of necessity will not ordinarily be recognized if there is another mode of access to the land, though much less convenient; that is, as has been sometimes

said, a way of convenience is not a way of necessity." Tiffany on Real Property, Vol. 3, 3rd Ed., sec. 794.

The Blair deed went far beyond the implied mining rights to which the grantors would have been entitled under the terms of plaintiff's offer. It reserved to them the right to drill for oil and gas, construct temporary tanks, and transport oil and gas across the land, locate tipples and shafts, construct and use tramways, pipe lines, electric power lines, roadways and other means of transportation on and across the land, all in such a way as not to unreasonably interfere with grantee's mining operations. The grantee, as owner of the surface, might wish to make other use of it than for the mining of coal. He might improve the surface with farms, buildings, landscaping, or in any other way to suit his own wishes. The grantors might find it convenient to erect tipples, tanks or tramways, or to locate a gas or oil well on the very spot chosen by the grantee for the improvement. Under the reservations of the Blair deed, they would have the right to do any of these things, provided they did not *unreasonably* interfere with the grantee's mining operations.

Moreover, the Blair deed reservations clearly contemplate a joint use of the surface for the exercise of mining rights. They contemplate *some* interference, beyond what would be strictly necessary, with the grantee's mining operations; else there would be no point in using the word "unreasonably" in that connection. These, in my opinion, are burdens which the grantee could not be required to assume on the basis of any implications contained in his simple offer to buy the upper coal seams and the surface.

The Blair deed described the property to be conveyed as "all the land which lies above and at a higher elevation than 2005 feet" contained within the designated boundary. Plaintiff's offer to purchase, as shown by the terms of the Hoffstot deed, contemplated a conveyance of all the land above 2000 feet. For this reason, also, the Blair deed cannot be regarded as an unqualified acceptance of plaintiff's offer. Plaintiff was not bound at this point in the negotiations, even if the Blair deed had contained no explicit reservations of mining rights, because he could not have been required to accept a deed for land above 2005 feet elevation, when his offer to purchase had included also the land between 2000 and 2005 feet elevation. It appears from the evidence that this variation of five feet in elevation may not have affected the rights of the parties seriously. Nevertheless, it was a matter that must have been agreed upon before a binding contract could be established. It was not a typographical error, but a considered change, as is shown by the exhibit itself, in which, wherever the figures occur, they appear to have been altered from the original typewritten characters (probably "2500") to read "2005."

█ ██ We have, then, upon delivery to plaintiff of the Blair deed, a situation in which plaintiff, having offered to purchase from Blair, Berthy and Dickinson the land above 2000 feet elevation, with only implied access rights to be reserved to the grantors, has been offered by Blair (which offer was later ratified by Berthy) a deed for the land above 2005 feet elevation, with reservations of access rights more favorable to the grantors than those implied in the offer. Dickinson has made no offer to convey any surface whatever, and I find in the evidence nothing to warrant plaintiff's contention that he authorized his co-owners, either by words or conduct, to make such an offer on his behalf. On the contrary, the evidence is clear that he, at the August meeting between the parties, openly and flatly disclaimed any intention of parting with his interest in the surface. The Blair deed, therefore, even if it were held to be an acceptance of plaintiff's offer by Blair and Berthy, would not bind Dickinson to convey anything. It was not his offer.

█ Nor would the defendants Emma D. Blair, Rose H. Berthy and Maude H. Dickinson, have been bound by any contract that might be held to have resulted from delivery of the Blair deed. There is no evidence that any one of them ever made an offer to plaintiff, or accepted an offer made by him. They each possess an in-

choate right of dower in an undivided one-third of the land owned by their respective husbands. West Virginia Code, Chapter 43, Article 1, Section 1.

When plaintiff came to Charleston on May 27, 1946, there was open to him for acceptance an offer by Blair, acting for himself and Berthy (and purporting to act for Dickinson and for the wives of all three, but without any authority, so far as the evidence discloses, to do so), to convey the land on the terms of the Blair deed, for the price of $19,700. Plaintiff's first act on that occasion was to present to Blair the Hoffstot deed, with the statement that it contained the terms on which he was willing to purchase the land. These terms varied from those of the Blair deed in three significant particulars: (1) The Hoffstot deed called for more land than was included in the Blair deed. (2) The Hoffstot deed contained reservations of mining rights to the grantors much less favorable to them than those in the Blair deed. (3) The Hoffstot deed conveyed to the grantee surface rights in the adjoining property of the grantors.

These variations were not in the nature of mere "suggestions" and "corrections," as plaintiff would have the Court believe. They constituted material changes in the very subject matter of the negotiations. Plaintiff, by making the counter offer represented by the Hoffstot deed, thereby rejected the offer made by Blair and Berthy embraced in the Blair deed. They were at liberty, if they chose, to drop all negotiations. That they continued to negotiate, and later made a further offer, concurred in by Dickinson, to convey according to the Blair deed, plus an additional reservation of a right of way for the grantors over the surface of the 400 acre tract for the benefit of their adjoining lands, certainly did not operate in any way to restore or revive the Blair deed as an offer. When plaintiff, by his letter of May 28, 1946, purported to accept the offer of the Blair deed, it was no longer open for acceptance. Restatement of Contracts, sec. 38; Hancock v. Fletcher, supra; Bowers Co. v. Kanawha Valley Products Co., 1925, 100 W.Va. 278, 130 S.E. 284; Weaver v. Burr, supra.

Since plaintiff has failed to prove any contract, either oral or written, the defense of the Statute of Frauds becomes inapplicable.

The complaint will be dismissed.